IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ANDREW PAUL VERA,<br>　　　Plaintiff, | §<br>§<br>§<br>§ | |
| v. | §<br>§<br>§ | CIVIL ACTION NO. 1:24-cv-1158-ML |
| CITY OF AUSTIN,<br>　　　Defendant. | §<br>§<br>§ | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant City of Austin ("the City") files this Motion for Summary Judgment ("Motion") on Plaintiff Andrew Paul Vera's ("Vera") claims under Federal Rule of Civil Procedure 56 and, in support, shows as follows:

**I.　　SUMMARY**

Vera filed this lawsuit because he disputes the conclusions of four licensed psychologists, who each found him mentally unfit for duty with the Austin Police Department ("APD"). After two incidents triggered concerns about his mental health, APD initiated the fitness-for-duty process under Texas Local Government Code Chapter 143 (the "Civil Service Act" or "CSA"). A three-member board of psychologists unanimously determined he was unfit, and the City terminated his employment. Vera now seeks to overturn the board's determination.

Vera's CSA claim fails for lack of subject-matter jurisdiction because the CSA's limited waiver of governmental immunity does not permit a police officer to appeal an independent board's fitness-for-duty determination directly to district court. In any event, APD, the City's Firefighters', Police Officers', and Emergency Medical Services Personnel's Civil Service Commission ("Commission"), and City officials complied with the CSA and all applicable rules

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT　　　　　　　　　　　　　　　　1

throughout the process.

Vera also contends the Commission violated the Texas Open Meetings Act ("TOMA") when it met to appoint psychologists to evaluate him. But those meetings were not subject to TOMA and, even if they were, the Commission substantially complied. TOMA does not entitle Vera the extraordinary relief he seeks.

Although Vera maintains he was fit for duty, he simultaneously asserts disability-based failure to accommodate and retaliation. These claims fail because he was not a qualified individual with a disability, never sought a timely accommodation, never engaged in protected activity, and there was no causal connection establishing retaliation. His true grievance appears to be dissatisfaction with the City's handling of an Internal Affairs complaint he filed. His Texas Constitution claims also fail because the Constitution gives no private right of action in this context. The Court should thus grant the City's Motion and dismiss all of Plaintiff's claims.

## II.    STATEMENT OF FACTS

### A.    Vera files a concerning Internal Affairs complaint.

Vera began his career as a commissioned APD police officer in 2011. His employment was regulated by the Commission, which governs the promotion, suspension, and termination of Austin police, fire, and EMS personnel under the CSA.[1] In his daily work, Vera patrolled his assigned area and responded to calls.[2]

On August 7, 2021, Vera filed an Internal Affairs ("IA") complaint alleging a conspiracy within APD to manufacture events for training and "propaganda."[3] He questioned whether APD was influenced by "fake news"[4] and claimed officers disparaged and "shun[ned]" him, spread

---

[1] Ex. A, Decl. of Matthew Chustz, ¶ 3.
[2] Ex. F, Vera Dep. 44:22–24.
[3] Ex. J, IA Complaint, at COA (Vera) 001059.
[4] *Id*.

rumors, made "disturbing" comments, attempted to "hurt [his] psyche," and even tried to "influence" him to take his own life.[5] He claimed these incidents triggered an "extreme mental crisis" in April 2017.[6] He alleged these events were orchestrated to "target" him, and he made several ominous statements, including that harassment can cause permanent harm, that stress is worse when the "threat" comes from supervisors or coworkers, that an officer's mental breakdown is inevitable, and that any line-of-duty death involving an officer with mental health struggles should be investigated for possible "influence" by other officers."[7] Two days later, concerned for Vera's well-being, APD placed him on paid administrative leave, relieved him of duty, and confiscated his service weapon.[8]

### B.    Vera undergoes an initial fitness-for-duty evaluation.

On August 18, 2021, Chief of Police Joseph Chacon notified Vera that his IA complaint cast doubt on his mental fitness for duty.[9] A psychologist who reviewed Vera's IA complaint observed "possible delusional and paranoid thought processes" and recommended an immediate evaluation to assess any "suicidal or homicidal ideations."[10] Under section 143.081(b) of the CSA, Chief Chacon ordered Vera to submit a report from his personal doctor regarding his mental fitness and provided a form to be returned to the Civil Service Office ("CSO"), the Commission's administrative support.[11] The memo also explained that if the Chief questioned the doctor's report, the CSA permitted him to request a Commission-appointed doctor for further examination.[12]

On September 17, 2021, Vera's selected psychologist, Dr. Darla D. Absher, found him

---

[5] *Id.* at COA (Vera) 001061–62.
[6] *Id.* at COA (Vera) 001060.
[7] *Id.* at COA (Vera) 001063.
[8] Ex. K, Administrative Leave Memo; Ex. F, Vera Dep. 166:9–167:7.
[9] Ex. A, Decl. of Matthew Chustz, ¶ 29, Ex. A-1, August 18, 2021, APD Memorandum at COA (Vera) 000163–64.
[10] *Id.*
[11] *Id.* at ¶¶ 3, 4, 29, Ex. A-1, August 18, 2021, APD Memorandum at COA (Vera) 000163–67.
[12] *Id.* at ¶ 29, Ex. A-1, August 18, 2021, APD Memorandum at COA (Vera) 000164.

mentally fit for duty and able to complete the essential functions of his role.[13] Chief Chacon reviewed the report but could not reconcile its conclusory statement of fitness with the conspiratorial allegations in Vera's IA complaint.[14] He thus notified the CSO that he questioned the report and requested an independent evaluation.[15] After posting public notice four days in advance, the Commission held a November 1, 2021, meeting and appointed Dr. Stephen Thorne.[16]

Dr. Thorne evaluated Vera, and on December 24, 2021, issued a report noting that, while Vera had significantly compromised emotional and psychological functioning, input from APD officials and a previous medical opinion, in part, led him to conclude that Vera was "presently fit for duty."[17] Vera then returned to work.[18]

### C.    Vera's "unsettling" behavior triggers a second fitness-for-duty evaluation.

On February 7, 2022, IA investigators interviewed Vera about his complaint.[19] During the interview, he expanded his conspiracy theories, not only claiming coworkers, supervisors, and members of the medical community were involved, but also asserting APD sent officers on "fake calls," including a staged shooting.[20] Vera became "extremely emotional several times" and suggested that many work interactions did not "add up."[21] The investigators, their chain of command, and Chief Chacon found this behavior "deeply unsettling," triggering "significant concerns" about Vera's mental health.[22]

Chief Chacon concluded that Vera's interview revealed new, more serious concerns that

---

[13] *Id.* at ¶ 30, Ex. A-2, Initial Completed Personal Physician Checklist.
[14] Ex. E, Decl. of Joseph Chacon, ¶ 6.
[15] Ex. A, Decl. of Matthew Chustz, ¶ 31; Ex. A-3, October 15, 2021, APD Memorandum.
[16] *Id.* at ¶¶ 6, 32–34, Ex. A-4, A-5, A-6; Ex. B, Decl. of Michael Sullivan, ¶¶ 4, 9, Ex. B-1; Ex. D, Decl. of Stephanie Hall, ¶¶ 10–12, 23, 24, Ex. D-1, D-2.
[17] Ex. A, Decl. of Matthew Chustz, ¶ 35, Ex. A-7, Dr. Thorne Report at COA (Vera) 000202–03.
[18] Ex. F, Vera Dep. at 158:20–24, 167:8–10; Ex. E, Decl. of Joseph Chacon, ¶ 7.
[19] Ex. A, Decl. of Matthew Chustz, ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum at COA (Vera) 000187.
[20] *Id.* at ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum at COA (Vera) 000187–88.
[21] *Id.* at ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum at COA (Vera) 000188; Ex. F, Vera Dep. 182:1–3 (conceding he became emotional during the interview).
[22] *Id.*; Ex. I, Angeles Dep. 42:12–16 (testifying she was "concerned about his mental health").

were not evident from the IA complaint, noting Vera's increasingly elaborate conspiracy theories and his choice to wear sunglasses throughout the nearly two-hour indoor interview.[23] On February 11, 2022, Chief Chacon sent another memo questioning Vera's mental fitness and again requested a personal-doctor report under §143.081(b).[24] Vera promptly called Dr. Absher, who told him to come to her office so they could immediately "knock [] out" a second evaluation.[25] Dr. Absher submitted a second report within an hour, again finding Vera fit for duty.[26]

Six days later, Chief Chacon notified the CSO that he questioned Dr. Absher's second report and requested another independent evaluation.[27] Due to the swiftness of the report, Chief Chacon doubted whether Dr. Absher had enough time to conduct a meaningful assessment or knew the extent of Vera's IA interview behavior.[28]

On February 21, 2022, Vera's commanding officer reassigned him to administrative duty handling phone calls at the City's Combined Transportation, Emergency & Communications Center,[29] and Vera relinquished his service weapon.[30] APD opted for this assignment rather than additional administrative leave, during which officers must remain at home during work hours, because Chief Chacon believed further administrative leave could worsen Vera's mental health.[31]

After giving public notice three days in advance, the Commission held a March 10, 2022, Special Called Meeting and appointed Dr. Leonard Weiss to evaluate Vera.[32] The minutes of the

---

[23] Ex. E, Decl. of Joseph Chacon, ¶ 8.
[24] Ex. A, Decl. of Matthew Chustz, ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum.
[25] Ex. F, Vera Dep. 183:25–184:10, 188:7–18.
[26] Ex. E, Decl. of Joseph Chacon, ¶ 11; Ex. A, Decl. of Matthew Chustz, ¶ 37, Ex. A-9, Second Completed Personal Physician Checklist.
[27] Ex. A, Decl. of Matthew Chustz, ¶ 38, Ex. A-10, February 17, 2022, APD Memorandum.
[28] Ex. E, Decl. of Joseph Chacon, ¶ 11.
[29] Ex. L, Administrative Duty Memo, at COA (Vera) 000190–93.
[30] *Id.* at COA (Vera) 000192.
[31] Ex. E, Decl. of Joseph Chacon, ¶ 13.
[32] Ex. A, Decl. of Matthew Chustz, ¶¶ 10, 39–41, 43 Ex. A-11, A-12, A-13, A-15; Ex. B, Decl. of Michael Sullivan, ¶¶ 5, 10, Ex. B-2; Ex. D, Decl. of Stephanie Hall, ¶¶ 13–15, 25, 26, Ex. D-3, D-4.

---

meeting were later corrected to clarify the correct Commissioner who called the meeting to order.[33]

On April 24, 2022, Dr. Weiss concluded that Vera was unfit for duty.[34] After reviewing video of the IA interview,[35] among other things, Dr. Weiss noted Vera's suspicions toward APD, refusal to ride with partners, tendency to prolong investigations because he believed the department was "propagandizing,"[36] and tendency to go "down a rabbit hole" when performing his duties.[37] He specifically noted that Vera could not "assess potential consequences" of actions or "take control of a chaotic situation."[38] Dr. Weiss found Vera posed a "substantial danger" of failing to perform his duties "given his current mindset."[39] While Dr. Weiss recommended medical and neurological testing, he cautioned that Vera would likely refuse it.[40] Of the 68 essential functions of a police officer that were not purely physical requirements, Dr. Weiss found that Vera could not perform 46 of them.[41] He concluded there were "no accommodations that would allow" Vera to perform the essential functions of his job.[42]

### D.    Internal Affairs investigates Vera's complaint.

Meanwhile, IA investigated Vera's complaint, identifying at least seven witnesses beginning on August 24, 2021.[43] IA reviewed reports of incidents Vera claimed were manufactured and memoranda from officers familiar with Vera's employment, interviewed eleven officers, including Vera, and investigated each issue he raised.[44] After reviewing the information

---

[33] Ex. A, Decl. of Matthew Chustz, ¶¶ 12, 13, 40–42, Ex. A-12, March 10, 2022, Original Meeting Minutes at 1, Ex. A-13, March 10, 2022, Amended Meeting Minutes at 1, Ex. A-14, January 18, 2024, Meeting Minutes at 2.
[34] Ex. A, Decl. of Matthew Chustz, ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001350.
[35] Ex. M, Weiss-Sullivan Emails.
[36] Ex. A, Decl. of Matthew Chustz, ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001350.
[37] *Id.*
[38] *Id.* at ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001354.
[39] *Id.* at ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001350.
[40] *Id.* at ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001357.
[41] *Id.* at ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001352–56.
[42] *Id.* at ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001357.
[43] Ex. N, IA Do-Not-Discuss Memos.
[44] Ex. O, IA Case Summary, at COA (Vera) 001534–35; Ex. I, Angeles Dep. 62:9–12.

collected, Sergeant Christina Angeles, who led the investigation, concluded that Vera had not been subjected to harassment.[45] Consistent with APD practice, she relayed her findings to Vera's chain of command for a final determination.[46]

### E.    The Commission appoints a three-member board of psychologists.

On April 26, 2022, Vera's union attorney asked the Commission to appoint a three-member board to examine Vera.[47] After posting public notice four days in advance, the Commission met on May 3, 2022, and concluded that Dr. Absher's second report conflicted with Dr. Weiss's report.[48] Under section 143.081(d) of the CSA, the Commission appointed an independent, three-member board of psychologists (the "Board") consisting of Dr. Ronnette Ballard (lead), Dr. Krista Jordan, and Dr. Elizabeth Levy.[49] Dr. Ballard had a doctorate in clinical psychology, had more than a decade of private-practice experience, and had performed numerous fitness-for-duty evaluations, including for police officers.[50]

On May 11, 2022, Dr. Levy withdrew, so the Commission met on June 6, 2022 (after posting public notice four days earlier) and replaced Dr. Levy with Dr. Melissa Siebert.[51] Dr. Siebert had conducted several fitness-for-duty evaluations and had earned her Doctor of Psychology approximately five years earlier.[52] The Commission's June 6 order required Vera to authorize Dr. Ballard "to communicate with the Commission and any other medical professionals involved" in his fitness-for-duty process.[53] Only Dr. Ballard received this authority to limit public

---

[45] Ex. I, Angeles Dep. 39:13–15.

[46] *Id.* at 47:9–48:3, 49:23.

[47] Ex. P, Plaintiff's Request for Board; Ex. F, Vera Dep. 194:5–9.

[48] Ex. A, Decl. of Matthew Chustz, ¶¶ 14, 18, 45–47, Ex. A-17, A-18, A-19; Ex. B, Decl. of Michael Sullivan, ¶¶ 6, 11, Ex. B-3; Ex. D, Decl. of Stephanie Hall, ¶¶ 16–18, 27, 28, Ex. D-5, D-6.

[49] Ex. A, Decl. of Matthew Chustz, ¶ 47, Ex. A-19, May 3, 2022, Order of the Commission.

[50] Ex. G, Ballard Dep. 12:3–23.

[51] Ex. A, Decl. of Matthew Chustz, ¶¶ 19, 23, 48–50, Ex. A-20, A-21, A-22; Ex. B, Decl. of Michael Sullivan, ¶¶ 7, 12, Ex. B-4; Ex. D, Decl. of Stephanie Hall, ¶¶ 19–21, 29, 30, Ex. D-7, D-8.

[52] Ex. H, Siebert Dep. 13:24–14:11, 17:10–18.

[53] *See* Ex. A, Decl. of Matthew Chustz, ¶ 50, Ex. A-22, June 6, 2022, Order of the Commission. While the June 6, 2022, Order mentioned other medical professionals "involved in the appeal for hiring process," rather than Vera's

disclosure of Vera's confidential information.[54]

During the evaluation process, Dr. Jordan asked the CSO if she could speak to Dr. Absher to understand her prior conclusions.[55] Similarly, Dr. Siebert expressed concern of a "clear conflict" regarding Dr. Absher's dual role as evaluator and treating psychologist.[56] Dr. Siebert wanted to hear Dr. Absher's answers to the Board's questions—whether those answers were directed to Dr. Siebert or someone else—to see if Dr. Absher was aware of the level of delusions Dr. Siebert found to be present in Vera.[57] While Dr. Ballard was free to reach out to Dr. Absher directly, Dr. Ballard asked Matthew Chustz, the CSO's Municipal & Civil Service Manager, to facilitate contact with Dr. Absher.[58] All three Board members drafted questions for Dr. Absher.[59] Chustz then compiled and sent the questions to Dr. Absher unchanged on July 15, 2022, instructing her to respond only to Dr. Ballard.[60] Dr. Ballard viewed Chustz as acting solely as a liaison.[61] Dr. Absher answered the Board's written questions, and the Board members agreed the responses were useful and helped to inform their decision.[62] Dr. Siebert was not aware of a Board member being unable to speak with a prior psychological evaluator of Vera.[63]

All three Board members interviewed Vera.[64] In one interview, he asserted that APD "staged" a murder-suicide by placing dead bodies at a crime scene and suggested that an x-ray of a shooting victim had been "faked" by taping a bullet to the man's skin, speculating this was done

---

"fitness-for-duty process," this was an inadvertent error. *Id.* at ¶ 23.
[54] Ex. A, Decl. of Matthew Chustz, ¶ 25.
[55] *Id.* at ¶ 26.
[56] Ex. H, Siebert Dep. 25:12–18, 53:12–14.
[57] *Id.* at 31:9–20.
[58] Ex. A, Decl. of Matthew Chustz, ¶ 26; Ex. G, Ballard Dep. 80:20–81:16.
[59] Ex. H, Siebert Dep. 33:17–21.
[60] Ex. A, Decl. of Matthew Chustz, ¶¶ 27, 51, Ex. A-23, Board Questions; Ex. Q, Chustz-Absher Emails (the Bates stamps on these emails, produced by Plaintiff, incorrectly identify the defendant in this matter as "AISD" rather than the City of Austin).
[61] Ex. G, Ballard Dep. 93:6–8.
[62] *Id.* at 88:6–23, 94:15–16, 103:25–104:9; Ex. H, Siebert Dep. 85:22–86:2.
[63] Ex. H, Siebert Dep. 60:25–61:5.
[64] Ex. A, Decl. of Matthew Chustz, ¶ 52, Ex. A-24, Board Report.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                    **8**

for police officer "training" or because officers had "too much down time."[65] Dr. Ballard spent ten to twenty hours on the evaluation and found Vera exhibited paranoid-type delusional thinking that made him believe he was being persecuted.[66] This created a risk that Vera might react to a threat that did not actually exist.[67] Dr. Ballard concluded she did not need to speak with Vera's coworkers because his pathology was clear from her interviews alone.[68]

Dr. Siebert likewise found it "abundantly clear" Vera was "delusional" and embraced "pervasive" conspiracy theories preventing him from working with others.[69] She noted he questioned police and medical personnel, acted hostile towards APD, and struggled to distinguish reality.[70] She considered his delusional beliefs—such as APD dragging dead bodies to scenes— "extremely dangerous" because misperceiving a threat could lead to him improperly using force.[71] During her evaluation, Vera also revealed he had been trying to sue the City for years.[72]

**F.      Vera's employment is terminated after the Board finds him unfit for duty.**

On July 26, 2022, the Board unanimously concluded that Vera's mental health was "compromised," rendering him unfit for duty.[73] The Board's report outlined the psychological tests administered and the materials reviewed, including all reports from Drs. Absher, Thorne, and Weiss, and relevant APD and City memoranda.[74] Dr. Seibert confirmed the Board also reviewed the video of Vera's IA interview.[75] Each psychologist also conducted an in-depth, in-person interview with Vera.[76] Although Dr. Weiss had previously recommended a neurological workup,

---

[65] *Id.* at ¶ 51, Ex. A-23, Board Questions.
[66] Ex. G, Ballard Dep. 34:22–25; 101:25–102:13.
[67] *Id.* at 102:23–103:1.
[68] *Id.* at 56:2–11, 57:7–18, 58:2–9.
[69] Ex. H, Siebert Dep. 36:12–14, 39:16–23, 59:15–18.
[70] *Id.* at 39:21–23.
[71] *Id.* at 89:22–90:6; 90:9–17.
[72] *Id.* at 93:1–7.
[73] Ex. A, Decl. of Matthew Chustz, ¶ 52, Ex. A-24, Board Report at COA (Vera) 000149.
[74] *Id.*
[75] Ex. H, Siebert Dep. 41:1–4.
[76] Ex. A, Decl. of Matthew Chustz, ¶ 52, Ex. A-24, Board Report at COA (Vera) 000149.

Dr. Seibert believed its results would not change the fitness determination because, whether Vera's issues were medical or psychological, his symptoms still prevented him from performing his duties.[77] Dr. Ballard also was aware of Dr. Weiss's recommendation, but she considered medical treatment outside the scope of the Board's work.[78]

On July 29, 2022, the City's Human Resources Department provided Vera with the Board's report.[79] Ten days later—August 8, 2022—Vera filed his Original Petition in this action challenging the Board's decision.[80] Nine days after Vera filed his Original Petition, Chief Chacon sent Vera a memo stating that he could not in good conscience disregard the Board's findings and that Vera's employment was terminated effective August 17, 2022.[81]

## III.   PROCEDURAL BACKGROUND

Vera filed this action in state court on August 8, 2022, asserting various claims against the City relating to his employment and the Board's determination.[82] In more than two years of state-court litigation, Vera amended his pleading six times.[83] He filed his Sixth Amended Complaint ("SAC") on September 5, 2024.[84] The SAC asserts claims under the CSA, TOMA, the Texas Human Resources Code ("THRC"), Title VII, the ADA, the Rehabilitation Act ("Rehab Act"), and the Texas Constitution.[85] Because the SAC asserted federal claims, the City removed the case to this Court on September 27, 2024.[86]

---

[77] Ex. H, Siebert Dep. 27:11–28:1.
[78] Ex. G, Ballard Dep. 59:13–60:5, 61:13–20.
[79] Ex. A, Decl. of Matthew Chustz, ¶ 53, Ex. A-25, Email Providing Board Report.
[80] ECF No. 6-2 at 2, Plaintiff's Original Petition.
[81] Ex. A, Decl. of Matthew Chustz, ¶ 54, Ex. A-26, Termination Memorandum.
[82] *See* ECF No. 6-2 at 2, Plaintiff's Original Petition.
[83] *See* ECF No. 6-2 at 2 ("Plaintiff's Original Petition"), ECF No. 6-2 at 16 ("Plaintiff's First Amended Petition"), ECF No. 6-2 at 91 ("Plaintiff's Second Amended Petition"), ECF No. 6-2 at 95 ("Plaintiff's Third Amended Petition"), ECF No. 6-2 at 110 ("Plaintiff's Fourth Amended Petition"), ECF No. 6-2 at 124 ("Plaintiff's Fifth Amended Petition"); ECF No. 6-4 at 205 ("Plaintiff's Sixth Amended Complaint").
[84] *See* ECF No. 16.
[85] *See id.*
[86] *See* ECF No. 1.

On December 20, 2024, the Court officially docketed Vera's SAC as the operative complaint.[87] On January 6, 2026, Vera and the City jointly filed a Joint Stipulation of Dismissal in Part, which dismissed Vera's Title VII and ADA claims.[88] Accordingly, Vera's remaining claims arise under the (1) CSA, (2) TOMA, (3) Rehab Act, (4) THRC, and (5) Texas Constitution.

## IV.    ARGUMENT AND AUTHORITY

### A.    This Court lacks subject-matter jurisdiction to hear Vera's CSA claim, and, in any event, this claim fails as a matter of law.

#### 1.    This Court lacks subject matter to hear Vera's CSA claim.

Vera's SAC alleges that the City violated the CSA.[89] The CSA sets procedures for a city's Fire Fighters' and Police Officers' Civil Service Commission, which administers the statute. *See* Tex. Loc. Gov't Code §§ 143.001(a)–(b), 143.002(a)(1)(C), 143.003(1).

Before reaching the merits, this Court must "assure itself of its own jurisdiction." *Elldakli v. Garland*, 64 F.4th 666, 669 (5th Cir. 2023). To invoke the Court's subject-matter jurisdiction, Vera must overcome the City's governmental immunity. *See Lubbock Cnty. Water Control & Imp. Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 300 (Tex. 2014). "Governmental immunity is a common-law doctrine that derives from the sovereign immunity that shields the State, its agencies, and its officials." *City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 512 (Tex. App.—Austin 2014, no pet.) (citations omitted). Governmental immunity bars suits against local government entities absent an express waiver, depriving courts of subject-matter jurisdiction. *Church & Akin, L.L.C.*, 442 S.W.3d at 300. A plaintiff "must establish a waiver of immunity" when suing "the State or one of its political subdivisions" for violations of the CSA. *City of San Antonio Fire Fighters' & Police Officers' Civ. Serv. Comm'n v. Saenz*, 672 S.W.3d 481, 483 (Tex.

---

[87] *See* ECF No. 15. at 5; ECF No. 16.

[88] *See* ECF No. 45.

[89] ECF No. 16 at ¶ 84. The CSA is codified in Chapter 143 of the Texas Local Government Code. *See City of New Braunfels v. Tovar*, 463 S.W.3d 913, 915 (Tex. App.—Austin 2015, no pet.) (citations omitted).

App.—San Antonio 2023, no pet.).

CSA section 143.015(a) permits a police officer "dissatisfied with any commission decision" to "file a petition in district court asking that the decision be set aside." This right to challenge a *commission* decision is a "limited waiver" of governmental immunity. *City of New Braunfels v. Tovar*, 463 S.W.3d 913, 918 (Tex. App.—Austin 2015, no pet.) But immunity is waived only when the plaintiff appeals an actual "decision of the commission"; otherwise, section 143.015(a) "does not waive immunity." *City of Austin Firefighters' & Police Officers' Civ. Serv. Comm'n v. Casady*, No. 03-17-00763-CV, 2018 WL 3321192, at *5 (Tex. App.—Austin July 6, 2018, pet. denied) (immunity not waived where plaintiff failed to appeal a "decision of the Commission"). Courts consistently hold that a fire fighter or police officer (hereinafter referred to as a "municipal officer") may seek judicial review only *after* administratively appealing the questioned personnel action to the city's commission or hearing examiner. *See, e.g.*, *Stubbs v. City of Weslaco*, No. 13-14-00054-CV, 2015 WL 124310, at *5–6 (Tex. App.—Corpus Christi Jan. 8, 2015, no pet.) (dismissing claim for reinstatement of fire fighter who sought district court review of termination before appealing his termination to commission or hearing examiner because "the commission or hearing examiner has exclusive jurisdiction over these claims").

Here, Vera does not appeal a Commission decision but, rather, the independent Board's finding that he was unfit for duty.[90] His Original Petition—filed before his termination— challenged "the board opinion that he was not fit to serve as a police officer," and the SAC continues to treat the Board's report as a final, judicially appealable decision.[91] However, because Vera has not appealed a decision of the Commission, there is no waiver of immunity.[92]

---

[90] *See* ECF No. 6-2 at 3, Plaintiff's Original Petition at ¶ 6; *see also* Ex. F, Vera Dep. 13:10–17 (testifying that he filed suit before he was terminated).
[91] *See* ECF No. 16 at 3, ¶¶ 8–9.
[92] Further, even if Vera had appealed a Commission decision, any such appeal would be untimely. The most recent

In fact, an independent board's fitness determination is not even appealable to the commission. CSA section 143.081 permits municipal officers to "appeal to the commission" only those qualifying personnel actions for which the CSA expressly provides a right of appeal—chiefly suspensions and terminations. Tex. Loc. Gov't Code §§ 143.010(a), 143.052(b),(d), 143.053(b); *see also City of Hou. v. Dunbar*, No. 14-21-00570-CV, 2023 WL 3596260, at *2 (Tex. App.—Houston [14th Dist.] May 23, 2023, pet. denied) (fire fighter appealed three-day suspension to Houston commission, then to district court); *City of Laredo v. Buenrostro*, 357 S.W.3d 118, 119, 121 (Tex. App.—San Antonio 2011, no pet.) (terminated police officer appealed termination decision to commission).[93]

Only after appealing such a personnel action to the commission may an officer seek judicial review under section 143.015(a). Thus, because an independent board's medical finding is not appealable to the commission, it is likewise not appealable to a district court. And for good reason—a district court, no matter how well-informed, is undoubtedly less equipped than an independent three-member board of licensed psychologists to determine the mental fitness of a weapon-carrying police officer.

Moreover, section 143.081(d) specifies that a three-member independent board "shall

Commission decision was its June 6, 2022, order appointing the reformed Board. However, if Vera attempts to base his appeal on that decision, his lawsuit is not timely: A police officer's petition asking that a commission decision be set aside must be filed "within 10 days after the date the final commission decision is sent to the fire fighter or police officer by certified mail or is personally received by the fire fighter or police officer or by that person's designee." *See* Tex. Loc. Gov't Code § 143.015(a). Vera filed his Original Petition on August 8, 2022, more than two months after the June 6, 2022, order. Therefore, even if Vera had appealed a Commission decision—which he did not—his lawsuit would not be timely.

[93] Additionally, a municipal officer who was temporarily suspended without pay for a felony indictment or other criminal charge who is later found not guilty may also appeal to the commission for recovery of back pay. Tex. Loc. Gov't Code §143.056(a), (e). Finally, the Civil Service Act recognizes, at least implicitly, that a municipal officer may appeal a "promotional bypass" or "recommended demotion" to the commission. *See* Tex. Loc. Gov't Code § 143.057 (stating that a written notice for a promotional bypass or letter of disciplinary action issued to a fire fighter or police officer "must state that in an appeal of an indefinite suspension, a suspension, a promotional bypass, or a recommended demotion, the appealing fire fighter or police officer may elect to appeal to an independent third party hearing examiner instead of to the commission").

determine" an officer's fitness for duty—underscoring that the Legislature assigned this determination to mental-health professionals, not the courts. *See* Tex. Loc. Gov't Code § 143.081(d). Because the CSA provides no mechanism for judicial review of a board's fitness finding, Vera cannot overcome the City's governmental immunity, and his CSA claim fails for lack of subject-matter jurisdiction. On this basis alone, Vera's CSA claim must be dismissed.

2. <u>Even if the Court had subject-matter jurisdiction, Vera's CSA claim still fails as a matter of law.</u>

Even if Vera could establish subject-matter jurisdiction, his CSA claim fails as a matter of law because the City's decisions satisfy the standard for review of Commission actions.

a. *Standard of Review Under Section 143.015*

Vera faces a heavy burden in seeking to overturn a Commission decision. Section 143.015(b) states that an appeal taken under that section is by "trial de novo," generally meaning a new trial. *Appraisal Rev. Bd. of Harris Cnty. Appraisal Dist. v. Spencer Square Ltd*, 252 S.W.3d 842, 845 (Tex. App.—Houston [14th Dist.] 2008, no pet.). However, courts have long held that "trial de novo" in this context is limited. Specifically, the trial court only determines whether the Commission's ruling is "free of the taint of any illegality and is reasonably supported by substantial evidence." *City of Hous. v. Cortez*, 640 S.W.3d 905, 909–10 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (citing *Firemen's & Policemen's Civ. Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984)).

Thus, this Court evaluates the "reasonableness of the administrative order, not its correctness." *Id.* at 911. "In fact, an administrative decision may be sustained even if the evidence preponderates against it." *Dunbar*, 2023 WL 3596260, at *3. That's because "a civil service commission's ruling enjoys a 'presumption of validity' in the trial court," as "the agency itself is the primary fact-finding body, and the question to be determined by the trial court is strictly one

of law." *Cortez*, 640 S.W.3d at 910. Critically, a court may not set aside a decision simply because it might reach a different result; it may do so only if the decision was unreasonable, arbitrary, capricious, or made without regard to the law or facts. *Id.* Despite the court's role as fact finder, it "may not substitute its judgment for that of the agency on controverted issues of fact." *Brinkmeyer*, 662 S.W.2d at 956.

Substantial evidence review is a limited standard of review, requiring "only more than a mere scintilla" to support a commission's determination. *Buenrostro*, 357 S.W.3d at 122. Courts routinely uphold Commission decisions despite conflicting evidence because resolving factual disputes is the Commission's role, not the court's. *See also Dunbar*, 2023 WL 3596260, at *3–5; *Buenrostro*, 357 S.W.3d at 121–123.

Conversely, a plaintiff can succeed only by showing the Commission's decision was not "free of the taint of any illegality." *Dunbar v. City of Houston*, 557 S.W.3d 745, 754 (Tex. App.— Houston [14th Dist.] 2018, pet. denied). The "taint of illegality" requires much more than a questionable decision based on available evidence—it requires a clear statutory violation. *See id.* (finding taint of illegality where commission suspended fire fighter beyond CSA's statute-of-limitations period prescribed for suspensions).

### b.    *Applicable Fitness-for-Duty Provisions of the CSA*

Under the CSA's fitness-for-duty procedures, when a question arises regarding whether a municipal officer is physically or mentally fit to continue duty, the officer must submit a report from his personal physician, psychiatrist, or psychologist. Tex. Loc. Gov't Code § 143.081(b). If the department head or commission "questions the report," the commission must appoint a medical professional to examine the officer and submit a report to the commission, the department head, and the person. *Id.* at § 143.081(c). If the appointed physician, psychiatrist, or psychologist's report "disagrees with" the report of the municipal officer's personal doctor's report, "the commission

shall appoint a three-member board composed of a physician, a psychiatrist, and a psychologist or any combination" to further evaluation. *Id.* at § 143.081(d). "The board's findings as to the person's fitness for duty *shall determine the issue*." *Id.* (emphasis added).[94]

The Commission's Rules and Regulations ("Rules") adopt this statutory process.[95] Under the Rules, if any report is not questioned "within 30 days from notification, the process will be concluded with no further action by the Commission."[96] Likewise, APD's General Orders authorize the Chief of Police to "invoke the fitness for duty process as outlined in Texas Local Government Code 143.081" whenever he or she questions a doctor's report.[97] Additionally, if a sworn employee "is designated not physically or mentally fit for duty by the process outlined in Texas Local Government Code 143.081, employment may be terminated."[98]

### c.    The Commission's actions were free of the taint of any illegality.

Even if Vera could challenge the Commission's decisions, he cannot overcome their "presumption of validity." *See Cortez*, 640 S.W.3d at 910. To prevail, Vera must show that the Commission's actions were "tainted by illegality" or made "without regard to the facts or the law and thus [were] unreasonable, arbitrary, capricious, or void." *See id.* at 908, 910. He cannot meet this burden, and the record supplies "more than a mere scintilla" supporting each Commission action. *See Buenrostro*, 357 S.W.3d at 122.

---

[94] These statutory procedures apply to municipalities with 10,000 or more residents but fewer than 1.5 million. Tex. Loc. Gov't Code § 143.002(a)(1)(A); 143.081(a). Population is determined by either the most recent federal decennial census or the annual population estimate provided by the state demographer under Chapter 468 of the Texas Government Code, whichever is more recent. *Id.* at § 143.002(b). The City respectfully asks that this Court take judicial notice of the 2020 United States Census Bureau's decennial determination that Austin's population is 961,855 people. *See* https://data.census.gov/profile/Austin_city,_Texas?g=160XX00US4805000. The Texas State Demographer provides population estimates for "counties," "Metropolitan Statistical Areas," and "Council of Governments," but not municipalities. *See* https://demographics.texas.gov/Estimates/2022/.
[95] Ex. A, Decl. of Matthew Chustz, ¶ 55, Ex. A-27, Commission Rules and Regulations, Rule 15.04.
[96] *Id.* at ¶ 55, Ex. A-27, Commission Rules and Regulations, Rule 15.04.
[97] Ex. C, Decl. of Lee Rogers, ¶¶ 9, 11; Ex. C-1, Rule 958.3(b), 958.4(c)(3); Ex. C-2, Rule 958.3(b), 958.4(c)(3); Ex. C-3, Rule 958.3(b), 958.4(d).
[98] *Id.* at ¶ 10; Ex. C-1, Rule 958.3.1(d)(3)(a); Ex. C-2, Rule 958.3.1(d)(3)(a); Ex. C-3, Rule 958.3.1(b)(3)(a).

At all times, the City complied with all fitness-for-duty procedures. A question about Vera's mental fitness first arose on August 18, 2021, after he filed his concerning IA complaint.[99] *See* Tex. Local Gov't Code § 143.081(b). After reviewing Dr. Absher's initial report, Chief Chacon questioned its conclusory nature in light of Vera's conspiratorial allegations and requested that the Commission appoint a doctor under §143.081(c).[100] *See id.* at § 143.081(c). The Commission appointed Dr. Thorne,[101] who found Vera fit for duty.[102] Because no one questioned Dr. Thorne's report within 30 days, the first fitness-for-duty process concluded[103] and Vera returned to work.[104] *See id.* at §143.081. Vera concedes it was "fair" for APD to conduct this fitness-for-duty process.[105]

On February 7, 2022, a second fitness-for-duty evaluation began after Vera displayed "deeply unsettling" behavior at his IA interview.[106] Vera concedes this behavior triggered a new fitness-for-duty evaluation independent of the first.[107] Within four days, Chief Chacon questioned whether Vera was mentally fit to continue his duties under section 143.081(b).[108] A second fitness-for-duty determination was necessary because, in Dr. Siebert's professional opinion, Vera's mental status "could have significantly changed" between Dr. Thorne's evaluation and the Board's eventual evaluation.[109]

As required, Chief Chacon asked Vera to submit a report from his personal physician,

---

[99] Ex. A, Decl. of Matthew Chustz, ¶ 29, Ex. A-1, August 18, 2021, APD Memorandum at COA (Vera) 000163–64.
[100] Ex. E, Decl. of Joseph Chacon, ¶ 6; Ex. A, Decl. of Matthew Chustz, ¶ 31; Ex. A-3, October 15, 2021, APD Memorandum.
[101] Ex. A, Decl. of Matthew Chustz, ¶ 34, Ex. A-6, November 1, 2021, Order of the Commission.
[102] *Id.* at ¶ 35, Ex. A-7, Dr. Thorne Report at COA (Vera) 000203.
[103] *Id.* at ¶ 55, Ex. A-27, Commission Rules and Regulations, Rule 15.04.
[104] Ex. F, Vera Dep. at 158:20–24.
[105] *Id.* at 171:8–13.
[106] Ex. A, Decl. of Matthew Chustz, ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum at COA (Vera) 000188.
[107] Ex. F, Vera Dep. 177:20–23, 178:22–25.
[108] Ex. A, Decl. of Matthew Chustz, ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum.
[109] Ex. H, Siebert Dep. 54:21–55:5.

psychologist, or psychiatrist,[110] which Vera did that same day.[111] *See id.* Because Vera produced the report within an hour of receiving the memo and because Dr. Absher may not have known about Vera's IA-interview behavior, Chief Chacon questioned the report and requested an independent evaluation under section143.081(c).[112] The Commission-appointed doctor, Dr. Weiss, concluded that Vera was unfit for duty.[113] Because Dr. Weiss's findings conflicted with Dr. Absher's, the Commission—at Vera's own request—appointed a three-member board under §143.081(d).[114]

After a thorough evaluation, including reviewing Dr. Absher's responses,[115] separately interviewing Vera and administering testing on him,[116] reviewing the IA interview video,[117] and conferring as a group,[118] the Board unanimously decided that Vera was unfit for duty.[119] Because an appointed three-member board's decision "shall determine the issue" of a police officer's mental fitness—and because APD's General Orders contemplate termination where a police officer has been deemed mentally unfit[120]—Chief Chacon terminated Vera's employment.[121] *See id.* As in *Buenrostro*, Chief Chacon stated that the termination decision was based on a unanimous conclusion on fitness.[122] *See* 357 S.W.3d at 123.

Vera's grievances about how the Board conducted its evaluation similarly fail to show any

---

[110] Ex. A, Decl. of Matthew Chustz, ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum at COA (Vera) 000188.
[111] *Id.* at ¶ 37, Ex. A-9, Second Completed Personal Physician Checklist.
[112] Ex. E, Decl. of Joseph Chacon, ¶ 11.
[113] Ex. A, Decl. of Matthew Chustz, ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001350.
[114] *Id.* at ¶ 47, Ex. A-19, May 3, 2022, Order of the Commission; Ex. F, Vera Dep. 194:5–9; Ex. P, Plaintiff's Request for Board.
[115] Ex. G, Ballard Dep. 94:15–16; Ex. H, Siebert Dep. 85:22–86:2.
[116] Ex. A, Decl. of Matthew Chustz, ¶ 52, Ex. A-24, Board Report.
[117] Ex. H, Siebert Dep. 41:1–4.
[118] *Id.* at 87:9–10.
[119] Ex. A, Decl. of Matthew Chustz, ¶ 52, Ex. A-24, Board Report at COA (Vera) 000149.
[120] Ex. C, Decl. of Lee Rogers, ¶ 10; Ex. C-1, Rule 958.3.1(d)(3)(a); Ex. C-2, Rule 958.3.1(d)(3)(a); Ex. C-3, Rule 958.3.1(b)(3)(a).
[121] Ex. A, Decl. of Matthew Chustz, ¶ 54, Ex. A-26, Termination Memorandum.
[122] *Id.* at ¶ 54, Ex. A-26, Termination Memorandum at COA (Vera) 000132.

"illegality." He seems to claim that the Commission improperly influenced the Board by either limiting or outright inventing the questions submitted to Dr. Absher.[123] Vera is mistaken. The Commission limited communication authority to Dr. Ballard solely to *protect* Vera's confidential information.[124] Dr. Ballard was free to contact Dr. Absher directly but instead chose to contact CSO liaison Chustz for administrative convenience.[125] Chustz simply forwarded the questions the Board posed to Dr. Absher without modification.[126] Vera's speculative and unsubstantiated claim that Chustz authored one of the questions contradicts Dr. Siebert's testimony that she drafted it.[127]

In the end, Dr. Absher received and answered every question the Board wished to ask her, Dr. Ballard had freedom to communicate with Dr. Absher, and the Board was satisfied with Dr. Absher's answers.[128] Vera admits that he has no evidence that the Commission limited the number of questions the Board asked Dr. Absher.[129] While Vera has claimed that the Board "did not complete their own checklist"[130] and that Dr. Ballard "did not follow" the Commission's orders,[131] when asked *how* the Board or Dr. Ballard failed to do these things, Vera could not explain.[132]

His argument that the Commission was required to appoint a psychiatrist also fails—the CSA expressly permits "any combination" of physician, psychiatrist, or psychologist.[133] *See* Tex.

---

[123] ECF No. 16 at ¶ 52 (alleging that the Commission prevented the Board from meeting with Dr. Absher), ¶ 69 (insinuating that Chustz himself submitted questions to Dr. Absher).

[124] Ex. A, Decl. of Matthew Chustz, ¶ 25.

[125] *Id.* at ¶¶ 26, 50, Ex. A-22, June 6, 2022, Order of the Commission (stating that Dr. Ballard could communicate with *either* the Commission *or* other medical professionals); Ex. G, Ballard Dep. 80:20–81:16 (testifying that she could speak to medical professionals and the Commission and noting that she "wasn't limited on what [she] could ask for").

[126] Ex. A, Decl. of Matthew Chustz, ¶¶ 27, 51, Ex. A-23, Board Questions.

[127] ECF No. 16 at 19, ¶ 69; Ex. A, Decl. of Matthew Chustz, ¶ 51, Ex. A-23, Board Questions; Ex. H, Siebert Dep. 85:2–17.

[128] Ex. A, Decl. of Matthew Chustz, ¶ 26; Ex. G, Ballard Dep. 80:20–81:16, 88:6–23 (testifying that she felt Board members were satisfied with submitting written questions), 94:15–16 (testifying that Dr. Absher answered the questions), 103:25–104:9 (testifying that the Board was satisfied with Dr. Absher's responses); Ex. H, Siebert Dep. 85:22–86:2 (testifying that Dr. Absher answered the questions).

[129] Ex. F, Vera Dep. 220:3–6.

[130] ECF No. 16 at ¶ 54.

[131] *Id.* at ¶ 51.

[132] Ex. F, Vera Dep. 217:10–219:15.

[133] ECF No. 16 at 18, ¶ 65.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                              **19**

Loc. Gov't Code § 143.081(d). Nor was the Board required to refer him for medical testing; its sole duty was to determine whether he was presently fit for duty.[134] And Vera identifies no binding "professional rules" the Board was required to follow.[135]

Vera's reliance on APD's Return to Work (RTW) program and ADA Committee is misplaced.[136] The provisions he cites appear only in outdated versions of the General Orders.[137] Rules discussing the Return to Work (RTW) program and the ADA Committee in the context of a fitness-for-duty evaluation appear in the General Orders effective June 1, 2020, through November 18, 2021, but not in subsequent versions effective during Vera's employment and termination.[138] But even if those provisions applied, participation in RTW is elective,[139] and Vera undisputedly did not elect to participate.[140] The ADA Committee review is merely a subset of the RTW program and is thus likewise inapplicable.

More broadly, APD's actions were not, as Vera claims, an effort to "attack the messenger,"[141] but reflected legitimate concern for Vera's and the public's safety.[142] APD takes its officers' mental health seriously,[143] and during Chief Chacon's tenure, he prioritized offering comprehensive wellness resources to officers—including the Ausin Public Safety Wellness Center, APD's Peer Support Unit, chaplains, psychologists and therapists on staff, and an

---

[134] *See* Ex. G, Ballard Dep. 101:9–14 (testifying that a Board's sole task is to determine whether the subject officer is mentally fit for duty); Ex. H, Siebert Dep. 23:22–25 (testifying that the Board's only concern is whether an officer can perform their job duties), 27:20–28:1 (testifying that Vera's symptoms prevented him from performing his job duties—regardless of the source of the symptoms).

[135] *See* ECF No. 16 at ¶ 66.

[136] *See id.* at ¶¶ 78–79.

[137] *See id.* at ¶ 29.

[138] Ex. C, Decl. of Lee Rogers, ¶¶ 6–8, *Compare* Ex. C-1, Rule 958.3.1(d)(3)(a), *with* Ex. C-2, Rule 958.3.1(d)(3)(a), *and* Ex. C-3, Rule 958.3.1(b)(3)(a).

[139] *Id.* at ¶ 6; Ex. C-1, Rule 958.3.1(d)(3)(a).

[140] Ex. F, Vera Dep. 170:8–10.

[141] ECF No. 16 at ¶ 1.

[142] Ex. E, Decl. of Joseph Chacon, ¶ 22.

[143] *Id.* at ¶ 16–19.

Employee Assistance Program.[144] APD heavily promoted these resources to its officers, including to Vera.[145] APD invoked the fitness-for-duty process not punitively but because Vera exhibited severe paranoia and delusional thinking incompatible with the duties of an armed police officer.

In sum, all personnel decisions made regarding Vera's employment followed the CSA, the Commission's Rules, APD's General Orders, and genuine concerns about the mental health of police officers. The Commission's actions were free of the taint of illegality, and this Court has no basis to substitute its own judgment for that of the Commission or Board. *See Brinkmeyer*, 662 S.W.2d at 956.

d.     *The Commission's decisions were reasonably supported by substantial evidence.*

Additionally, substantial evidence readily supports the decisions of the Board, the Commission, APD, and other City officials. Chief Chacon had substantial evidence to question Vera's mental fitness following the conspiracy-laden IA complaint[146] and again after Vera's "deeply unsettling" IA interview.[147] Chief Chacon also had substantial evidence to question Dr. Absher's conclusions, which lacked detail, conflicted with the behavior Chief Chacon observed, and, at least with the second report, was produced unusually fast (within an hour of the request).[148] Likewise, the Commission had substantial evidence to determination that Dr. Absher's second report conflicted with Dr. Weiss's, warranting appointment of the Board under section 143.081(d).[149] And, substantial evidence supported the Board's conclusion in the form of in-person interviews, recognized psychological tests, and a review of relevant records.[150]

---

[144] *Id.* at ¶ 19; Ex. I, Angeles Dep. 33:15–34:2.
[145] Ex. E, Decl. of Joseph Chacon, ¶ 20; Ex. I, Angeles Dep. 33:15–34:7.
[146] *See* Ex. J, IA Complaint.
[147] Ex. A, Decl. of Matthew Chustz, ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum at COA (Vera) 000188.
[148] Ex. E, Decl. of Joseph Chacon, ¶¶ 6, 11.
[149] Ex. A, Decl. of Matthew Chustz, ¶ 47, Ex. A-19, May 3, 2022, Order of the Commission.
[150] *Id.* at ¶ 52, Ex. A-24, Board Report at COA (Vera) 000149.

Even if Vera had properly appealed a decision of the Commission (which he did not) and presented evidence suggesting he was mentally fit, it is the Commission's role, not this Court's, "to weigh such conflicting evidence," and the question to be determined by this Court is strictly one of law. *See Dunbar*, 2023 WL 3596260, at *5; *Cortez*, 640 S.W.3d at 910. Because Vera's fitness-for-duty determination was free of the taint of any illegality and supported by substantial evidence, his CSA claim fails as a matter of law.

## B.    The Commission did not violate TOMA.

Vera asserts three arguments under TOMA. First, he claims he was not notified of the November 1, 2021, March 10, 2022, May 3, 2022, and June 6, 2022, Commission meetings (hereinafter the "Four Meetings"). Second, he argues that his name was improperly published in the minutes of the Four Meetings. Third, he challenges an inconsistency in the March 10, 2022, meeting minutes. These arguments fail because TOMA does not apply to the Four Meetings. Even if it did, each meeting substantially complied with TOMA.

### 1.    Applicable Provisions of TOMA

TOMA requires that "[e]very regular, special, or called meeting of a governmental body shall be open to the public," unless an exception applies. Tex. Gov't Code § 551.002. The Act does not, however, "require a governmental body to conduct an open meeting to deliberate the employment, discipline, or dismissal of a public employee unless the employee requests a public hearing." *Nix v. City of Beaumont*, No. 09-18-00407-CV, 2019 WL 4891704, at *5 (Tex. App.—Beaumont Oct. 3, 2019, no pet.) (citing Tex. Gov't Code § 551.074(a)(1), (b)).

If TOMA applies, the governmental body must "give written notice of the date, hour, place, and subject of each meeting" that it holds. Tex. Gov't Code § 551.041. At the time of the Four Meetings, notice had to be posted in a place readily accessible to the public for at least 72 hours

before the meeting unless an exception applied.[151] *Id.* § 551.043(a). *Municipal* governmental bodies must "post notice of each meeting on a physical or electronic bulletin board at a place convenient to the public in the city hall." *Id.* § 551.050(b). Courts liberally construe the term "bulletin board." *See Terrell v. Pampa Indep. Sch. Dist.*, 572 S.W.3d 294, 300 (Tex. App.—Amarillo 2019, pet. denied) (where school district posted notice on glass door in central administrative office, rather than bulletin board in same building, court held that the posting "substantially complied with the requirements of TOMA," even if the "more compliant approach" would have been posting to the actual bulletin board (citing Tex. Gov. Code § 551.051)).

TOMA also requires that a governmental body "prepare and keep minutes or make a recording of each open meeting." Tex. Gov't Code § 551.021. Actions taken in violation of TOMA are "voidable." *Id.* § 551.141 An interested person may seek mandamus or injunctive relief to stop, prevent, or reverse a violation. *Id.* § 551.142(a).

2.    The Four Meetings were not subject to TOMA.

First, all of Vera's TOMA arguments fail because the Four Meetings were not subject to TOMA. TOMA applies only to meetings of "governmental bodies." Tex. Gov't Code § 551.002. The Act's *thirteen* enumerated definitions of "governmental body" do not include a city's Civil Service Commission. *See id.* § 551.001(3). Second, even if a Civil Service Commission is arguably a governmental body, section 551.074 ("Personnel Matters") exempts meetings "to deliberate the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of a public officer or employee" unless the officer requests a public hearing. *See Nix*, 2019 WL 4891704, at *3. It is undisputed that Vera never requested a public hearing for any of the Four Meetings.[152]

---

[151] In 2025, the Texas Legislature amended the notice provision by requiring meetings to noticed "at least *three business days* before the scheduled *date* of the meeting." *See* Acts 2025, 89th Leg., ch. 1075 (H.B. 1522), §§ 1, 2, eff. Sept. 1, 2025 (emphases added).
[152] Ex. A, Decl. of Matthew Chustz, ¶¶ 7, 11, 15, 20.

By example, in *Nix*, a Fire Chief indefinitely suspended a fire fighter under the CSA. *See* 2019 WL 4891704, at \*2. The court held that a city was not required to conduct an open meeting or provide notice when deliberating the settlement agreement regarding the suspension because the matter involved employment and the firefighter had not requested a public hearing. *Id.* at \*3 (citing Tex. Gov't Code § 551.074(a)(1), (b)).

The same reasoning applies here. The Commission's discussions—including appointing doctors to evaluate Vera's fitness—concerned Vera's employment and therefore fell within section 551.074's exemption. Accordingly, the Commission was not required to hold open meetings or provide notice. Although it voluntarily noticed the meetings and posted minutes, it had no legal obligation to do so. All of Vera's TOMA arguments therefore fail.

          3.      <u>Vera cannot bring a TOMA claim because he failed to request a writ of mandamus.</u>

Vera also cannot maintain a TOMA claim because he did not seek mandamus relief. An interested party may bring a TOMA action **only** through mandamus or injunction. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 553–54 (Tex. 2019) (holding that section 551.142 limits the Act's immunity waiver to "the express relief provided"—injunctive and mandamus relief) (quoting *City of New Braunfels v. Carowest Land, Ltd.*, 549 S.W.3d 163 (Tex. App.—Austin 2017, pet. granted))). Texas law draws a clear distinction between mandamus and injunction. "When the purpose of the suit is to compel action, then mandamus is proper; conversely, when the purpose is to restrain action or threatened action, then an injunction is proper." *Campbell v. Wilder*, 487 S.W.3d 146, 153–54 (Tex. 2016) (quotation omitted). Here, Vera asks the Court to "reverse" decisions allegedly made in violation of TOMA.[153] That relief would compel governmental action.

---

[153] ECF No. 16, at ¶ 86.

Under section 551.142(a), Vera could seek such relief only through **mandamus**, which he did not request. His TOMA claim therefore fails as a matter of law.

        4.       <u>Even if the Four Meetings were subject to TOMA, the Commission substantially complied with TOMA's notice requirements.</u>

Even if the Four Meetings were subject to TOMA and Vera brought a mandamus action, the Commission substantially complied with the Act's notice requirements, as shown by the attached declarations of Michael Sullivan and Stephanie Hall.[154] Like any member of the public, Vera received notice of the Four Meetings when employees of the CSO and Austin City Clerk's Office ("ACCO") posted the meeting agendas online and at Austin City Hall.[155] The ACCO posted the meeting agendas on the Commission's public website at least 72 hours before each meeting[156] and physically posted them at City Hall at least three days in advance.[157] Although the City elected to physically post notices, it had no obligation to do so because the Commission is not a "municipal governmental body." *See* Tex. Gov't Code §§ 551.001(3), 551.050(b). All Four Meetings thus substantially complied with the Act's notice requirements. Further, Vera was not entitled to more notice than the public. *See Markowski v. City of Marlin*, 940 S.W.2d 720, 725–26 (Tex. App.—Waco 1997, no writ); *see also Palacios v. City of Crystal City, Tex.*, No. DR-11-CV-53-AM-VRG, 2014 WL 11320459, at *7 (W.D. Tex. Sept. 30, 2014). Accordingly, the Commission substantially complied with TOMA's notice requirements.

        5.       <u>TOMA does not require omission of Vera's name from the meeting agendas or minutes.</u>

---

[154] *See* Ex. B, Decl. of Michael Sullivan; Ex. D, Decl. of Stephanie Hall.

[155] Ex. B, Decl. of Michael Sullivan, ¶¶ 4–7, 9–12, Ex. B-1 through B-4 (BCIC Screenshots); Ex. D, Decl. of Stephanie Hall, ¶¶ 10–21, Ex. D-1 through D-8 (EDIMS Screenshots and Paper Copies).

[156] Ex. D, Decl. of Stephanie Hall, ¶¶ 10, 11, 13, 14, 16, 17, 19, 20, Ex. D-1, D-3, D-5, D-7.

[157] *See id.* at ¶¶ 12, 15, 18, 21, Ex. D-2, D-4, D-6, D-8.

Vera also argues that his name should not have appeared in the agenda or minutes of the Four Meetings.[158] He claims TOMA requires confidentiality for "persons who are the object of mental fitness concern,"[159] but no such requirement exists. Such a rule would undermine TOMA's core purpose: to make governmental decision-making accessible to the public. TOMA requires that "[p]ublic information is available to the public at a minimum during [] normal business hours." Tex. Gov't Code § 552.021. Information is excepted from this rule if it is "considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. This provision does not forbid disclosures; it simply gives governmental bodies the option to withhold confidential information. Vera has not and cannot identify any constitutional, statutory, or judicial decision requiring a public officer's name to be withheld when a governmental body deliberates the officer's mental health. *See id.* Therefore, the City did not violate TOMA by disclosing his name in the agenda or meeting minutes.

6.      The inconsistency in the March 10, 2022, meeting minutes was a harmless error.

The inconsistency in the March 10, 2022, meeting minutes was a harmless clerical error. Although the minutes initially stated that an absent Commissioner called the meeting to order, the CSO later corrected the mistake and posted amended meeting minutes properly reflecting that a present member called the meeting to order.[160]

There is little precedent addressing amended minutes, and Texas courts have not addressed whether a party may challenge corrections in minutes concerning deliberations on his public employment. *See Hext v. Cent. Educ. Agency*, 909 S.W.2d 252, 254 n.4 (Tex. App.—Austin 1995,

---

[158] ECF No. 16 at ¶¶ 36, 47, 50.

[159] *Id.* at ¶ 60.

[160] Ex. A, Decl. of Matthew Chustz, ¶¶ 12, 13; Ex. A-12, March 10, 2022, Original Meeting Minutes, A-13, March 10, 2022, Amended Meeting Minutes, Ex. A-14, January 18, 2024, Meeting Minutes at 2.

no writ) (declining to discuss whether such a party "may resist a correction of the minutes"). But common sense dictates that a typographical error—which can happen in the normal course of business[161]—should be disregarded because Vera was not harmed by it.[162] The amended minutes did not change any Commission action; they merely corrected who called the meeting to order. *See Sanchez v. Bd. of Adjustment for City of S. A.*, 387 S.W.3d 745, 751 (Tex. App.—El Paso 2012, pet. denied) ("Minutes are a permanent record of what *action* was taken at a meeting, not a record of what was said.") (emphasis added)). Whether or not the error occurred, two out of three Commission members were present, thus constituting a quorum and proper "meeting" under TOMA. *See* Tex. Gov't Code § 551.001(4)(A), (6). The vote to appoint Dr. Weiss was 2–0, regardless of whether the minutes accurately reflected who called the meeting to order. Therefore, the City did not violate TOMA through a clerical error in the minutes.

### C.    The City did not violate the Rehab Act or the THRC.

Next, Vera claims that the City failed to accommodate his alleged disability in violation of Section 504 of the Rehab Act and Chapter 121 of the THRC.[163] He further alleges that the City retaliated against him in violation of the Rehab Act "based upon his self-advocacy."[164] Vera's failure-to-accommodate arguments are without merit, namely because Vera was not a qualified individual with a disability. And Vera's retaliation claims fail because he did not engage in protected activity, and he did not suffer adverse employment action.

#### 1.    Applicable Law

Section 504 of the Rehab Act, codified at 29 U.S.C. § 794, provides: "No otherwise

---

[161] *Id.* at ¶ 13.

[162] Ex. F, Vera Dep. 224:12–225:15 (failing to explain how the typographical error harmed him).

[163] *See* ECF No. 16 at ¶¶ 2, 87–88, 90–91. While Vera's SAC alleges various forms of disability discrimination and retaliation under the ADA and Title VII, the parties filed a Joint Stipulation dismissing Vera's Title VII and ADA disparate treatment, failure to accommodate, and retaliation claims. *See* ECF No. 45.

[164] *Id.* at ¶ 91.

qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).[165],[166]

Chapter 121 of the THRC states: "It is the policy of the state that persons with disabilities be employed by the state, by political subdivisions of the state, in the public schools, and in all other employment supported in whole or in part by public funds on the same terms and conditions as persons without disabilities, unless it is shown that there is no reasonable accommodation that would enable a person with a disability to perform the essential elements of a job." Tex. Hum. Res. Code § 121.003(f). A "person with a disability" includes a person who has "a mental or physical disability" or an "intellectual or developmental disability." *See id.* § 121.002(4). Such a person may maintain an action for damages against an entity who violates section 121.003. *See id.* § 121.004(b). As with the Rehab Act, courts analyze the THRC under the same standards as the ADA. The Texas Supreme Court finds "the ADA and the case law interpreting it helpful in analyzing the" THRC. *See Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 68 (Tex. 2019). Thus, "[a]nalogous employment discrimination cases are relevant here in articulating the burden under the THRC." *Id* at 72. Because "the THRC's structure is similar to the ADA's as to prohibited discrimination," the THRC allows "for some lawful discrimination not inconsistent with the ADA." *Id.* at 68.

### 2.    Vera's failure to accommodate claim fails.

---

[165] Section 501 of the Rehab Act, not applicable here, covers employees who work directly for the federal government. *See* 29 U.S.C. § 791.

[166] The Rehab Act and ADA mirror each other substantively and "are judged under the same legal standards" as each other. *See* 29 USC §794(d); *Delano–Pyle v. Victoria Co.,* 302 F.3d 567, 574 (5th Cir. 2002). Further, The Fifth Circuit has consistently noted that "jurisprudence interpreting either section is applicable to both." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). The "relevant definition of disability" under the ADA is applicable to claims made under the Rehab Act. *See Smith v. McDonough*, No. SA-22-CV-01383-JKP, 2023 WL 5918322, at *7 (W.D. Tex. Sept. 8, 2023) (quoting *Kemp*, 610 F.3d at 234–35).

To establish a *prima facie* case of failure-to-accommodate under the Rehab Act, Vera must show that (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the City; and (3) the City failed to make reasonable accommodations for such known limitations. *See Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 837 (5th Cir. 2020).

### a.    Vera did not have a disability.

"A disability is a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011) (citing 29 C.F.R. § 1630.2(g)). "Major life activities refer to those activities that are of central importance to most people's everyday lives." *Id.* (citation omitted).

Contrary to the vague allegations in his SAC,[167] Vera's testimony reveals that he did not have a qualifying disability, nor did he believe that he was unfit for duty.[168] During his deposition he listed several physical injuries he experienced before working at APD, including injuries to his back, shoulder, nose, and eye, but he stated that these did not impact his ability to perform his duties as a police officer or prevent him from doing other major life activities like household chores, driving, or traveling.[169] He also identified mental health diagnoses—"suicidal ideations, post-traumatic stress disorder, and depression"[170]—but the symptoms either were mild, temporary, or manageable, never impacting his ability to perform his duties as police officer or substantially limiting his major life activities.[171]

Importantly, there is no evidence in the record that Vera informed APD of any of the

---

[167] *See* ECF No. 16 at ¶¶ 88, 90
[168] Ex. F, Vera Dep. 228:8–19.
[169] *Id.* at 55:21–57:9, 57:17–58:1, 58:16–24, 59:4–62:1, 63:8–22, 228:21–25.
[170] Ex. R, Excerpts of Pl.'s Resps. to Def.'s First Set of Interrogs. and Reqs. for Produc., Interrog. No. 8.
[171] Ex. F, Vera Dep. 125:13–25, 231:7–18, 234:1–4, 288:19–289:11.

limitations associated with the conditions he acknowledged. "A disabled plaintiff cannot remain silent and expect the defendant to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation." *Pena Arita v. Cnty. of Starr, Tex.*, No. 7:19-CV-00288, 2020 WL 5505929, at *7 (S.D. Tex. Sept. 11, 2020) (cleaned up). Obviously, the City could not accommodate an unknown limitation resulting from an alleged disability. Because Vera cannot show that he had a disability that was known to the City, his claim fails.

> b.    *Vera was not qualified for his role.*

Ironically, while Vera testified that he is fit for duty, he also testified "So I believe I'm fit for duty, and I can do the job. If the Department doesn't think I'm fit for duty, then I have a disability."[172] Even if we accept that premise as true (that the fitness-for-duty exam suggests that APD regarded Vera as having an actual disability), Vera's claim still fails because he was not qualified for the role. "As a paramilitary organization charged with maintaining public safety, a police department must ensure that its officers are in peak physical and mental condition." *Taylor v. City of Shreveport*, 798 F.3d 276, 286 (5th Cir. 2015). Without question, and consistent with the essential functions outlined by the City, maintaining good psychological health is an essential function of a police officer.[173] *See Tiller v. City of Jackson*, No. 3:24-CV-94-KHJ-MTP, 2025 WL 1426092, at *1, *6 (S.D. Miss. May 16, 2025) (after psychologist determined that police officer was mentally unfit for duty and police department thereafter terminated him, court held that the officer's termination "was not prohibited under the ADA because he was unable to perform the essential functions of his job").

Vera's compromised psychological health rendered him unable to perform more than two-thirds of the essential functions of his job requiring cognitive ability—which included "assess[ing]

---

[172] *Id.* at 228:8–20.
[173] Ex. A, Decl. of Matthew Chustz, ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001352–56.

potential consequences" of actions and "tak[ing] control of a chaotic situation."[174] Once the Board agreed with that assessment and found Vera unfit for duty—which Chief Chacon could not refute—that assessment rendered Vera unqualified for his position. *See Gloster v. ArcelorMittal LaPlace, LLC*, No. CIV.A. 13-3852, 2014 WL 1329870, at *10 (E.D. La. Mar. 31, 2014) (where doctor determined employee was "not fit for duty," employee failed to establish that he was qualified for his position); *Vasquez v. Union Pac. R.R. Co.*, No. 5-22-CV-00478-OLG-RBF, 2024 WL 4312257, at *10 (W.D. Tex. Aug. 26, 2024), *report and recommendation adopted*, No. SA-22-CV-478-OLG, 2024 WL 4314952 (W.D. Tex. Sept. 23, 2024) ("Because Vasquez was not qualified for the position, due to his inability to safely perform various essential functions of the job, his failure-to-accommodate claim fails."). Because Vera was unqualified for the role, his claim fails.

> c.      *Vera did not request any timely disability-based accommodations.*

Even if Vera had a known, qualifying disability, he never requested a disability-based accommodation. The employee who "needs an accommodation because of a disability has the responsibility of informing [his] employer." *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 485 (5th Cir. 2023) (quoting *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009)); *see also Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) ("It is the plaintiff's burden to request reasonable accommodations."). Put differently, "[e]mployers cannot be expected to anticipate all the problems that a disability may create on the job and spontaneously accommodate them." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 n.4 (5th Cir. 1999) (citation omitted). "[O]nce the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that together they can determine what reasonable

---

[174] *Id.* at ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001354.

accommodations might be available." *Chevron Phillips*, 570 F.3d at 622 (emphasis removed) (citing *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)). Thus, the interactive process is triggered only after an employee requests an accommodation.

Here, there is no evidence that Vera ever requested a disability-related accommodation. Instead, Vera relies upon his requests to give up his Mental Health Officer ("MHO") duties and transfer back to an evening shift in 2017.[175] These requests are time-barred by the requisite two-year statute of limitations. *See Frame v. City of Arlington*, 657 F.3d 215, 237 (5th Cir. 2011) (applying Texas's two-year statute of limitations for personal-injury claims to the Rehab Act (citing *Hickey v. Irving Indep. Sch. Dist.*, 976 F.2d 980, 983 (5th Cir. 1992)). Even if these requests were not time barred, they were not clearly tied to a known disability, and, in any event, APD *granted* them.[176]

In claiming that the City failed to "consider providing Vera any reasonable accommodation so that he could remain on a job with City in some capacity"[177] following the fitness-for-duty evaluation, Vera misunderstands the City's legal obligations under the Rehab Act. As briefed above, the City had no duty to accommodate Vera because he was unqualified for his job. There also were "no accommodations that would allow" Vera to perform his job duties.[178] Chief Chacon could not in good conscience keep Vera at APD in light of the concerns raised about his mental health.[179]

Furthermore, while Vera may now speculate on the possibility of reassignment, he failed

---

[175] Ex. F, Vera Dep. 120:17–123:10, 230:22–23; Ex. R, Excerpts of Pl.'s Resps. to Def.'s First Set of Interrogs. and Reqs. for Produc., Interrog. No. 5 (stating that Vera's December 28, 2017, email requesting to be relieved of his MHO duties constituted his only request for accommodation and further stating that Vera mentioned his concerns with the day shift sometime before then); Ex. J, IA Complaint, at COA (Vera) 001060–61 (noting that Vera's request to return to the evening shift occurred in April 2017).
[176] Ex. F, Vera Dep. 137:23–138:1, 234:15–18
[177] ECF No. 16, at ¶ 76.
[178] Ex. A, Decl. of Matthew Chustz, ¶ 44, Ex. A-16, Dr. Weiss Report at COA (Vera) 001357.
[179] Ex. E, Decl. of Joseph Chacon, ¶ 15.

to offer evidence that another position existed for which he was qualified. *See Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) ("[R]eassignment to a different job may be a reasonable accommodation, but 'the plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform.'" (quoting *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007))). Further, Vera testified that he never requested to be placed in a different job with the City outside of APD (or to participate in the City's Back to Work program).[180] Vera testified that he did not request an accommodation, much less a reassignment.[181]

In sum, Vera never requested a disability-based accommodation within the applicable limitations period. In sum, his failure-to-accommodate claim under the Rehab Act must be dismissed.

### 3.    The City did not retaliate against Vera.

Vera also alleges that the City retaliated against him by instituting the fitness-for-duty process and terminating his employment because he filed his IA complaint, which he describes as "his self-advocacy."[182] To establish a *prima facie* case of retaliation under the Rehab Act, Vera must show that: (1) he engaged in a protected activity under the Rehab Act; (2) his employer took an adverse employment action against him; and (3) a causal connection existed between the adverse employment action and the protected activity. *Calderon v. Potter*, 113 F. App'x 586, 592 (5th Cir. 2004).

### a.    Vera did not engage in protected activity under the Rehab Act.

Vera cannot survive summary judgment because he did not engage in a protected activity

---

[180] Ex. F, Vera Dep. 242:11–18.
[181] *Id.* at 238:18–22.
[182] ECF No. 16, at ¶ 91.

covered by the Rehab Act, which includes "objecting to discriminatory treatment on the basis of disability." *K.G.S. v. Kemp*, No. 4:11-CV-303-A, 2011 WL 4635002, at *5 (N.D. Tex. Oct. 5, 2011); *Lopez-Baca v. Geren*, 599 F. Supp. 2d 744, 749 (W.D. Tex. 2008) (Rehab Act is invoked only when the "underlying protected activity is based on disability discrimination").

While Vera alleges in his SAC that he was "a victim of retaliation based upon his own self-advocacy," he never complained about *disability*-based discrimination during his employment.[183] Rather, he admitted that the only complaint he lodged, his IA complaint, was not a report of disability discrimination,[184] but, primarily, a plea for APD to investigate allegedly "fake" calls in order to prevent misuse of government resources.[185] Even if Vera submitted his IA complaint, in part, because, in his words, fellow officers were talking about "weird sexual things,"[186] he admitted those comments had nothing to do with disability discrimination,[187] and certainly, a sex-based complaint is not protected activity under the Rehab Act. *See e.g*, *Kemp*, 2011 WL 4635002, at *5 (court held that complaints of race-based harassment are not the type of protected activity contemplated by the Rehabilitation Act). Because he did not engage in a protected activity, Vera's retaliation claim fails.

        b.       *There is no causal connection between the adverse employment action and the protected activity.*

Even if the Court were to find that Vera engaged in a protected activity under the Rehab Act, which he did not, there is no evidence of a causal connection. The City terminated Vera's employment because a thorough and well-documented fitness-for-duty assessment declared him

---

[183] *Id.* at ¶ 91; Ex. F, Vera Dep. 243:1–4. For the avoidance of doubt, Vera's Original Petition, filed nine days before his termination, did not constitute protected activity under the Rehab Act because it did not assert any disability-discrimination claims. *See* ECF No. 6-2 at 2 ("Plaintiff's Original Petition").

[184] Ex. F, Vera Dep. 245:25–246:20 (initially stating that the IA complaint was a report of disability discrimination but later retracting that statement, explaining that he "misheard the question").

[185] *Id.* at 100:12–101:8, 178:12–21, 243:11–15, 251:13–15, 253:5–9.

[186] *Id.* at 113:11–19.

[187] *Id.* at 119:25–120:6.

unfit for duty—not because Vera filed an IA complaint or because retaliatory bias was present.[188] Vera relies entirely upon unsubstantiated speculation to support this claim. In fact, the undisputed evidence shows that even in spite of Vera's questionable mental state, APD *still* completed the investigation to its conclusion.[189] Because there is no causal connection, Vera's retaliation claim fails.

<blockquote>c.      The City offers uncontroverted proof of legitimate, non-retaliatory reasons for its actions.</blockquote>

Even if Vera could establish a *prima facie* case of retaliation, which he cannot, the City offers legitimate, non-retaliatory reasons for its actions. "[A]n employer's desire to confirm an employee's ability to perform his or her job through an authorized medical inquiry is a legitimate, non-retaliatory reason to refuse an employee's return to work." *Parker v. Benteler Steel*, No. 5:17-CV-01453, 2019 WL 2583110, at *11 (W.D. La. June 20, 2019), *aff'd sub nom. Parker v. Benteler Steel Tube Mfg. Corp.*, 815 F' App'x 760 (5th Cir. 2020). In *Fuentes v. Postmaster Gen. of U.S. Postal Serv.*, 282 F. App'x 296, 304 (5th Cir. 2008), an employer required its employee to undergo fitness-for-duty exams that would determine whether she was "mentally healthy to return to her position." Since the employee could not offer any evidence to prove that the employer's justifications were pretexts for retaliation, the court concluded that summary judgment was appropriate for the employer. *Id.*

The City's initiation of the two fitness-for-duty processes was not retaliation for Vera's filing an IA complaint or sitting for an IA interview.[190] Rather, it was a legitimate action instituted

---

[188] Ex. E, Decl. of Joseph Chacon, ¶¶ 5–15.

[189] Ex. I, Angeles Dep. 39:13–15; Ex. N, IA Do-Not-Discuss Memos; Ex. O, IA Case Summary, at COA (Vera) 001534–35; Ex. I, Angeles Dep. 62:9–12.

[190] Additionally, the fitness-for-duty process was not an adverse employment action. "Requiring a fitness-for-duty examination is not an adverse employment action in the Fifth Circuit." *Pete v. Barr*, No. 1:20-CV-00098-MJT-ZJH, 2022 WL 1275971, at *6 (E.D. Tex. Mar. 25, 2022), *report and recommendation adopted*, No. 1:20-CV-00098, 2022 WL 1271705 (E.D. Tex. Apr. 27, 2022) (citing *Anderson v. City of Dall.*, 116 F. App'x 19, 27 (5th Cir. 2004)). Neither is "psychological testing." *See Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (citing *Benningfield v.*

to determine if Vera was still mentally capable of performing his admittedly stressful duties. Ordering testing to ensure an employee's ability to perform his duties easily constitutes a legitimate, non-retaliatory reason.

Further, the Board's determination that Vera was mentally unfit for duty was a legitimate, non-retaliatory reason for terminating his employment. *See Bibbs v. Motiva Enterprises LLC*, 757 F. Supp. 3d 726, 748 (E.D. Tex. 2024) (noting that reliance on a doctor's opinion that employee could not perform the essential functions of his job, with or without reasonable accommodations, constituted legitimate, nondiscriminatory reason for termination (citing *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020)); *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 698 (5th Cir. 2014) ("[T]he ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so."). Importantly, "[t]he ADA does not prohibit adverse action due to a consequence of a disability, such as being unable to perform essential job duties because of an injury or illness." *Tiller*, 2025 WL 1426092 at *6. Thus, the City offers legitimate, non-retaliatory reasons for its actions.

> d.    *Vera offers no evidence that the City's actions were pretext for retaliation.*

Having articulated legitimate and non-retaliatory reasons for its actions, the burden shifts back to Vera to show those reasons are pretextual. Pretext must be supported by "substantial" evidence. *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). Vera may demonstrate pretext through

---

*City of Hous.*, 157 F.3d 369, 376 (5th Cir. 1998)). That is because simply *ordering* a fitness-for-duty examination does not affect a term or condition of employment. *See Pete*, 2022 WL 1275971, at *6. Accordingly, Vera did not experience adverse employment action in response to his IA complaint. *See id.* at *2, *10 (holding that defendant's issuing of fitness-for-duty letter directing plaintiff to undergo a medical examination to determine whether he had the required physical or mental condition to go back to work did not constitute adverse employment action in the retaliation context).

evidence of disparate treatment or by showing that the City's reasons are false or unworthy of credence. *See Mueck*, 75 F.4th at 483–84 (quoting *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 527 (5th Cir. 2022)). Vera can show neither.

Vera offers no evidence of disparate treatment—"that is, evidence showing that he was treated differently, and worse, than non-disabled employees." *See id.* at 484. Critically, courts require that an employee asserting disability retaliation "who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken under *nearly identical circumstances*." *See id.* (emphasis added) (citing *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). The "nearly identical circumstances" standard is a stringent one; employees with different responsibilities, different supervisors, different capabilities, or different disciplinary records are not considered to be "nearly identical" under the law. *See Okoye v. Univ. of Tex. Hous. Health Science Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (citations omitted); *see also Perez v. Texas Dep't of Crim. Just., Institutional Div.*, 395 F.3d 206, 213 (5th Cir. 2004) ("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'" (citations omitted)). Decisions by different supervisors are rarely 'similarly situated.'" *Mitchell v. Energy Transfer Partners, LP*, No. CV H-14-2784, 2017 WL 536596, at *4 (S.D. Tex. Feb. 9, 2017) (citing *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971 (E.D. Tex. 2004)), *aff'd sub nom. Mitchell v. Energy Transfer Partners, L.P.*, 711 F. App'x 245 (5th Cir. 2018).

Here, Vera has not, and cannot, identify any other officers who submitted an IA complaint alleging APD conspiracies or who exhibited "deeply unsettling" behavior at an IA interview.[191] Therefore, Vera cannot demonstrate that other similarly situated individuals engaged in the same

---

[191] Ex. J, IA Complaint; Ex. A, Decl. of Matthew Chustz, ¶ 36, Ex. A-8, February 11, 2022, APD Memorandum at COA (Vera) 000188.

conduct and were treated more favorably.

Further, Vera has not demonstrated that the City's articulated reasons for its actions are false or unworthy of credence. While Vera believes the City retaliated against him, "[i]t is black letter law that an employee's speculation or subjective belief that he was retaliated against because he engaged in protected activity cannot establish pretext." *Monsivais v. Arbitron, Inc.*, 44 F. Supp. 3d 702, 719 (S.D. Tex. 2014) (*citing Septimus v. Univ. of Hous.*, 399 F.3d 601, 611 (5th Cir. 2005)); *see also Pennington v. Tex. Dep't of Family & Protective Servs.*, 469 F. App'x 332, 339 (5th Cir. 2012) ("[Employee's] subjective belief that she was the victim of retaliation, even if that belief is genuine, is insufficient to carry her case without further evidence of pretext.").

Even if Vera were to claim that the City made the "wrong" decision in initiating the fitness-for-duty process—which it did not—that assertion would not support his retaliation claim. Employers are required to make non-retaliatory decisions, not perfect ones. *See Coleman v. Jason Pharm.*, 540 F. App'x 302, 305 (5th Cir. 2013) ("Because even an incorrect belief that an employee's performance is inadequate qualifies as a legitimate reason to terminate an at-will employee, an employee must submit evidence to support an inference that the employer had a retaliatory motive, not just an incorrect belief." (citation omitted)).

Here, while Vera might disagree with the fitness-for-duty evaluations that led to his termination, he has not shown that the City acted in bad faith. Because Vera has not demonstrated either disparate treatment or that the City's reasons for its actions are false or unworthy of credence, he fails to provide evidence of pretext.

**D.    There is no private right of action under Article 1, section 19 and Article 1, section 13 of the Texas Constitution.**

Finally, Vera claims that the City violated his rights to Due Process of Law and Due Course of Law under Article 1, section 19 and Article 1, section 13, respectively, of the Texas

Constitution. Thes claims fail because these constitutional provisions do not imply a private right of action for damages against a governmental unit.

"Texas has no provision comparable to [42 U.S.C.] § 1983". *Donohue v. Dominguez*, 486 S.W.3d 50, 56 (Tex. App.—San Antonio 2016, pet. denied) (citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 147 (Tex. 1995)). In *Bouillion*, the Texas Supreme court held that there is no implied private right of action for damages under the Texas Constitution when an individual alleges the violation of speech and assembly rights. *See* 896 S.W.2d at 149. Courts have since concluded that this holding "applies to violations of other provisions in the Texas Constitution as well, including a plaintiff's right to due course of law." *Tex. A & M Univ. Sys. v. Luxemburg*, 93 S.W.3d 410, 425 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Thus, "[g]enerally, there is no private cause of action against a governmental entity or its officials for money damages relating to alleged violations of Texas constitutional rights." *Donohue*, 486 S.W.3d at 56. "'Only if the language of the specific [constitutional] provisions involved clearly impl[ies]' a private action for damages does the Texas Constitution create one." *Id.* (citing *Brown v. De La Cruz*, 156 S.W.3d 560, 563 (Tex. 2004)).

Neither Article 1, section 13 nor Article 1, section 19 of the Texas Constitution implies "a private right of action for damages against the governmental unit that would exist apart from the Texas Tort Claims Act."[192] *Id.* (holding that none of sections 9, 13, or 19 of Article 1 implies a private right of action). Accordingly, Vera's claims "based solely on alleged violations of his

---

[192] The Texas Tort Claims Act ("TTCA") provides that governmental units are liable for "property damage, personal injury, and death" proximately caused by a governmental employee operating a "motor-driven vehicle or motor-driven equipment" or "personal injury and death so caused by a condition or use of tangible personal or real property." Tex. Civ. Prac. & Rem. Code § 101.021. Here, Vera does not assert claims under the TTCA. Nor can he, as he does not allege that a governmental employee caused him property damage, personal injury, or death caused by a motor vehicle or by a condition or use of tangible personal or real property.

Texas constitutional rights" are "frivolous as lacking an arguable basis in law." *See Hamilton v. Pechacek*, 319 S.W.3d 801, 812 (Tex. App.—Fort Worth 2010, no pet.).

## V.    CONCLUSION

In sum, Vera's CSA claim fails for lack of subject-matter jurisdiction, and, in any event, APD, the Commission, and other City officials complied with all applicable rules and regulations. Vera's TOMA claims fail because the meetings in question were not subject to TOMA and, even if they were, they substantially complied with the statute. Further, his Rehab Act failure-to-accommodate and retaliation claims are meritless because Vera was not a qualified individual with a disability during his employment, he never requested a disability-based accommodation, he never engaged in protected activity, and there is no causal connection establishing retaliation. Finally, the Texas Constitution provides no private right of action to bring Vera's constitutional claims. For these reasons, the Court should grant the City's Motion and dismiss all of Vera's claims.

Dated:        March 2, 2026                    Respectfully submitted,


                                               /s/ *Melissa J. Ackie*
                                               Melissa J. Ackie
                                               Texas Bar No. 24088686
                                               mackie@littler.com
                                               Josh K. Ordiway
                                               Texas Bar No. 24126538
                                               jordiway@littler.com

                                               LITTLER MENDELSON, P.C.
                                               100 Congress Avenue, Suite 1400
                                               Austin, TX  78701
                                               Telephone:  512.982.7250
                                               Facsimile:  512.982.7248

                                               **ATTORNEYS FOR DEFENDANT
                                               CITY OF AUSTIN**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2026, a copy of the foregoing document has been electronically filed with the Court, and served on the following by CM/ECF:

Martin J. Cirkiel
Julianna S. Swann
Melissa Pleasant
Cirkiel Law Group, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
marty@cirkielaw.com
julianna@cirkielaw.com
melissa@cirkielaw.com

***Attorneys for Plaintiff***


*/s/ Josh Ordiway*
Josh Ordiway